IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

STUART L. PETERSON,

    Plaintiff,

v.

AWJ GLOBAL SUSTAINABLE FUND, LP,

    Defendant.

No. 15-cv-00650-CRB

**ORDER DENYING IN PART AND GRANTING IN PART AWJ'S MOTION TO DISMISS**

Now before the Court is a motion to dismiss by Defendant AWJ Global Sustainable Fund, LP ("AWJ"), arguing that Plaintiff Stuart L. Peterson's breach of contract and unjust enrichment action fails to state a claim. See Mot. (dkt. 32). For the following reasons, the Court DENIES the Motion in part as to the breach of contract claim and GRANTS the Motion in part as to the unjust enrichment claim.

## I.    FACTUAL BACKGROUND

Peterson is the President and Portfolio Manager of Artis Capital Management, LP ("Artis"). Amended Complaint (dkt. 31) (hereinafter "Compl.") ¶ 2.[1] Artis Capital Management is the General Partner of a clean energy technology fund called Artis Clean

---

[1] This factual background "presume[s] all factual allegations of the complaint to be true and draw[s] all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987).

Tech Partners, LP (the "Fund"). Id. ¶ 3. AWJ is a Minneapolis-based "fund of funds" that makes investments in other hedge funds; AWJ is a limited partner in the Fund. Id. ¶ 3.

The relationship between the involved parties here—Peterson, Artis, and AWJ—is governed by a contractual Limited Partner Agreement ("LP Agreement"). Id. ¶¶ 2–4. Under the LP Agreement, limited partners who wish to withdraw some or all of their investment from the Fund must submit a fund redemption request, after which they are supposed to receive (1) a partial redemption in cash and (2) a Liquidating Capital Account representing the investor's pro rata interest in the Fund's holdings of, as relevant here, a renewable fuel company called KiOR, Inc. ("Kior"). Id. ¶ 4. This structure is designed to protect the Fund's substantial investment in Kior (the Fund owns over half of Kior's stock) by allowing that investment to grow without any disruptions caused by immediate redemptions. Id.

Peterson alleges that Goldman Sachs (Cayman) Trust, Limited ("Goldman"), which served as the administrator for the Fund, made an administrative error by paying out AWJ's redemption wholly in cash, without transferring any of the payment to a Liquidating Capital Account representing AWJ's pro rata interest in Kior stock. Compl. ¶ 5. Peterson brought suit against AWJ to recover the portion of the payment that Goldman should have transferred into the Liquidating Capital Account—a total of $778,244.35—alleging breach of contract and unjust enrichment claims in his complaint. See Compl. AWJ now moves to dismiss under Fed. R. Civ. P. 12(b)(6).

**II.  LEGAL STANDARD**

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While it need not contain detailed factual allegations to withstand a motion to dismiss, the complaint must allege enough facts to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In reviewing a motion to dismiss, the Court "must presume all factual allegations of the

2

complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987).

## III.   DISCUSSION

AWJ argues that the case should be dismissed because both (a) the breach of contract and (b) the unjust enrichment causes of action fail to state a claim sufficient to withstand dismissal under Fed. R. Civ. P. 12(b)(6). See Usher 828 F.2d at 561.

### A.   Breach of Contract

The parties agree that Delaware law applies to the breach of contract claim here; under "Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by defendant; and (3) a resulting damage to plaintiff." Locuspoint Networks, LLC v. D.T.V. LLC, No. 14-CV-01278-JSC, 2015 WL 2398168, at *4 (N.D. Cal. May 19, 2015) (citing H–M Wexford LLC v. Encorp., Inc., 832 A.2d 129, 140 (Del. Ct. Ch. May 27, 2003)). Peterson alleges that AWJ breached the LP Agreement by (1) receiving a full cash withdrawal of its Fund investment rather than receiving a mixed redemption of both cash and shares in a Liquidating Capital Account and (2) failing to return the portion of the withdrawal that would have been Liquidating Capital Account shares but for Goldman's accidental full cash distribution.

#### 1.   Whether AWJ Breached the LP Agreement by Receiving Its Investment in Cash Rather than in a Mixed Payment of Cash and Liquidating Capital Account Shares

According to AWJ, the Complaint fails to show that AWJ's receipt of $778,244.35 (the "disputed amount")—transferred by Goldman, the Fund's own agent—breached the LP Agreement. See Locuspoint Networks, 2015 WL 2398168 at *4. AWJ asserts that Goldman made an administrative error and sent AWJ a full cash redemption of its investment without any prompting by AWJ. See Mot. at 6. In response, Peterson points to allegations in the Complaint that state AWJ violated the LP Agreement's restrictions on excess capital withdrawals. Opp'n at 4 (dkt. 34); Compl. ¶ 69. For the following reasons, this Court concludes that Peterson has properly alleged a breach of contract claim against AWJ.

3

The breach of contract dispute turns on whether Goldman and AWJ complied with the withdrawal process established by the LP Agreement at the time AWJ withdrew the disputed amount from the Fund. Section 9.3 of the LP Agreement sets out the proper procedure for withdrawals by Limited Partners. See Compl. Ex. A ("LP Agreement") (dkt. 31-1) § 9.3. According to that section, a limited partner may withdraw all or part of its Capital Account balance. Id. § 9.3(a). The Fund, however, "may own Illiquid Securities that the General Partner believes should not be (i) sold to generate cash proceeds to fund Partner withdrawals, (ii) distributed in kind or (iii) contributed to a Liquidating Fund to facilitate Partner withdrawals."[2] Id. § 9.3(d).

To protect these Illiquid Securities, the "General Partner may, in its exclusive discretion, establish a 'Liquidating Capital Account'" at the time a Limited Partner attempts to withdraw its Capital Account balance, and "in this event, the General Partner may allocate such Partner's pro rata share of the applicable Illiquid Securities to that Liquidating Capital Account as of the close of business on the withdrawal date." LP Agreement § 9.3(d). A partner's "initial Liquidating Capital Account balance shall equal the value of such pro rata share of such Illiquid Securities on [the withdrawal] date, and an equivalent amount shall be debited from that Partner's Capital Account balance." Id.; Compl. ¶ 58. The "Liquidating Capital Account balance may not be withdrawn by that Partner under the normal withdrawal provisions" and such balance "shall not be deemed part of that Partner's Capital Account." LP Agreement § 9.3(d). Instead, the "General Partner shall distribute the balance of each Liquidating Capital Account in cash or in kind (or both) when it deems appropriate less any contingencies that the General Partner identifies and elects to reserve for." Id.

The parties dispute whether Artis and AWJ followed these withdrawal procedures as outlined in the LP Agreement at the time AWJ made its withdrawal request, see Mot. at 6–11; Opp'n at 5–8. That question is relevant here because Delaware law provides that a plaintiff alleging breach of contract must demonstrate substantial compliance with all the

---

[2] The LP Agreement defines "Illiquid Securities" as "Securities that the Partnership holds that are restricted from transfer for any reason." See Compl. Ex. A, § 5.15. Kior shares appear to be the only relevant Illiquid Securities in this case. See Compl. ¶ 4.

4

provisions of his contract in order to recover damages. See, e.g., Edelstein v. Goldstein, No. 09C-05-034 DCS, 2011 WL 721490, at *5 (Del. Super. Mar. 1, 2011). AWJ argues that the LP Agreement required Artis to take several express steps before Artis could allocate AWJ's interest in Illiquid Securities to a Liquidating Capital Account and thereby prevent AWJ from redeeming those interests in cash. According to AWJ, Artis had to (1) "create a Liquidating Capital Account 'as of' 'the close of business on the withdrawal date,'" after which (2) Artis may "exercise its discretion to allocate the limited partner's pro rata share of the illiquid securities to it . . . 'as of' 'the close of business on the withdrawal date.'" Mot. at 7. AWJ asserts that the Fund did not comply with these requirements, arguing that "the Amended Complaint and Exhibit B to it show that no such account was established as of March 31, 2012, the withdrawal date, nor were the KiOR shares transferred to a Liquidating Capital Account at any point before the Disputed Amount was paid to AWJ." See Mot. at 9. AWJ notes that although a General Partner "may allocate" a Limited Partner's interest in specified Illiquid Securities to a Liquidating Capital Account, no allocation occurred because Goldman did not follow the required steps prior to transfer. Id. AWJ further argues that the term "'allocate' is synonymous with 'transfer,'" and "the Disputed Amount could not be transferred to a Liquidating Capital Account unless that account existed as of the withdrawal date." Id.

      Peterson responds, relying on Section 9.3 of the LP Agreement, that Artis has "exclusive discretion" to "allocate AWJ's pro rata interest as of the close of business on the withdrawal date." Opp'n at 7. He points to Exhibit B of the Amended Complaint—a Goldman spreadsheet that accounts for Limited Partner redemptions of fund assets—which lists "the establishment of the Liquidating Capital Account for AWJ and the simultaneous exchange from liquid capital to an interest in the Liquidating Capital Account as of close of business" on AWJ's withdrawal date. See id.; Compl. Ex. B (dkt. 31-2). Peterson contends that Artis did exercise its exclusive discretion to allocate such funds, Goldman's administrative transfer error notwithstanding, in that Goldman duly recorded the allocation on the March 31, 2012 withdrawal date. Opp'n at 7. Goldman made an entry on March 31,

5

2012 and stated in an email to AWJ that it "recorded the allocation of AWJ Fund's pro rata share of the Kior investment in the Fund in a Liquidating Capital Account . . . effective as of April 1, 2012." Compl. Ex. C ("Goldman Emails") (dkt. 31-3). According to Peterson, Goldman then made an administrative error and transferred the funds that it had "allocated" to a Liquidating Capital Account in cash, rather than in shares, to AWJ. Opp'n at 1.

Whether the complaint shows that Artis complied with the LP Agreement and allocated the disputed amount to a Liquidating Capital Account turns on resolving the parties' dispute over the meaning of the word "allocate," which is not defined in the LP Agreement. See Mot. at 7–9; Opp'n at 7. "Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract." Lorillard Tobacco Co. v. Am. Legacy Found., 903 A.2d 728, 738 (Del. 2006). Black's Law Dictionary defines "allocation" as a "designation or apportionment for a specific purpose," Black's Law Dictionary (10th ed. 2014), and the Oxford English Dictionary defines "allocate" as "[t]o set aside or designate as being the special share or responsibility of a particular person, department, etc., or as being required for a particular purpose; to apportion, allot," Oxford English Dictionary Online (2015).

Here, "presuming all factual allegations of the complaint to be true," see Usher 828 F.2d at 561, the Court concludes that Peterson has shown that Goldman "allocated" the funds to a Liquidating Capital Account by "setting aside" or "designating" the disputed amount to that account, notwithstanding the contrary, erroneous cash transfer Goldman made to AWJ. See Compl. ¶ 40; Compl. Ex. C ("Goldman Emails") (dkt. 31-3). The Complaint thus makes out a claim that (1) Artis properly allocated the Illiquid Securities to AWJ's Liquidating Capital Account pursuant to Section 9.3 of the LP Agreement, and (2) that AWJ is not entitled to keep the disputed amount because the "Liquidating Capital Account balance may not be withdrawn by that Partner under the normal withdrawal provisions" and such balance "shall not be deemed part of that Partner's Capital Account." See Compl. ¶ 58; LP Agreement § 9.3(d).

6

### 2. Whether AWJ Breached the LP Agreement by Failing to Return the Disputed Amount After Goldman Transferred it in Error

Peterson also argues that AWJ further breached the LP Agreement by failing to return the disputed amount of cash, alleging that AWJ's failure to return the money amounted to a withdrawal in excess of its Capital Account balance.[3] AWJ responds that Artis did not comply with the LP Agreement's provision for determining excess withdrawals, and thus Peterson's argument fails because the LP Agreement is governed by Delaware law, see Compl. ¶ 57; LP Agreement § 29, and Delaware law provides that a plaintiff alleging breach of contract must demonstrate substantial compliance with all the provisions of his contract in order to recover damages, see, e.g., Edelstein, 2011 WL 721490 at *5.  The Court concludes the Complaint establishes that (1) Artis has substantially complied with the LP Agreement, and (2) that AWJ's refusal to return the disputed amount is a withdrawal in excess of its Capital Account balance, so Peterson has properly alleged a breach of contract.

AWJ argues to the contrary that the LP Agreement only contains one provision governing the repayment of withdrawals made in excess of a limited partner's Capital Account balance, and that Artis has not established that AWJ made an excess withdrawal under that provision.  See Mot. at 12.  According to Section 9.3(a)(5) of the LP Agreement, "if the Outside Accountants determine that the amount paid by the Partnership exceeds the Capital Account balance, the Limited Partner shall forthwith, on demand by the General Partner, repay such excess to the partnership in cash."  Id.  AWJ asserts that outside accountants did not make a determination that it had been paid in excess of its Capital Account balance.  Mot. at 12.  AWJ admits that a financial statement prepared by Artis' managers and attached to an auditors' report filed as Exhibit D to the Complaint notes a receivable matching the disputed amount due from an unnamed limited partner.  Id.  AWJ contends that this document does not satisfy the requirement outlined in Section 9.3(a)(5)

---

[3] A Limited Partner's Capital Account is distinct from its Liquidating Capital Account.  The accounts are governed by separate provisions of the LP Agreement; Capital Account balances may be withdrawn in cash, but, absent a transfer error like the one made by Goldman, Liquidating Capital Account balances may not ordinarily be withdrawn in cash.  See LP Agreement § 9.3(b), (d).

7

because it was prepared by the Fund's managers, not by outside accountants, and thus the LP Agreement does not require AWJ to return the disputed amount. Id.

Peterson responds that the financial document identifying that a Limited Partner, ostensibly AWJ, owes the disputed amount to the Fund was incorporated into the outside accountants' report, and thus that it satisfies the Section 9.3(a)(5) requirements for a determination of payment made in excess of a Capital Account balance. Opp'n at 9. The Amended Complaint alleges that no limited partner other than AWJ received such an excess cash withdrawal. Compl. ¶ 50.

AWJ asserts that the Auditors' report consists exclusively of a one page opinion that only states the attached four pages of financial documents prepared by management fairly present the financial position of the Fund. Mot. at 4. Peterson responds that the Auditors' report consists of the Auditor's opinion and the four pages of attached financial statements, which, according to Peterson, were incorporated into the Auditor's report. See Mot. at 12; Opp'n at 9. In his Complaint, Peterson alleges that "Artis's outside auditor Rothstein completed the Fund's Financial Statements and Independent Auditors' Report . . . in which it found an amount receivable of $778,243 due from a limited partner, i.e. from AWJ." Compl. ¶ 43. Furthermore, the auditors' report indicates that the outside accountants have reviewed and verified the Fund's financial statements. Compl. Ex. D (dkt. 31-4).

Resolving whether the management documents, noting an amount receivable that matches AWJ's disputed cash withdrawal, are incorporated into the outside auditor's report is a close question, but "draw[ing] all reasonable inferences" in Peterson's favor, the complaint adequately alleges that the outside audit incorporates the four pages of management documents. See Usher, 828 F.2d at 561. Given that (1) the Amended Complaint alleges that no other investor received an excess withdrawal like the one listed in the management documents, and (2) the excess withdrawal exactly matches the disputed amount of cash received by AWJ, the Court concludes that Peterson has alleged a breach of contract because AWJ made an excess withdrawal as determined by outside auditors in violation of Section 9.3(a)(5) of the LP Agreement. See LP Agreement § 9.3.

### B. Unjust Enrichment

Peterson also brings an unjust enrichment claim against AWJ. Compl. ¶¶ 77–82. The parties dispute whether Delaware or California law applies to the unjust enrichment claim. Mot. at 13; Opp'n at 10. AWJ argues that Delaware applies pursuant to the choice-of-law provision in the LP Agreement, Mot. at 13, but Peterson claims that California law applies as the law of the state in which this Court sits, Opp'n at 10 (citing St. Paul Fire & Marine Ins. Co. v. Weiner, 606 F.2d 864, 867 (9th Cir. 1979) (holding that a forum state's substantive law applies to a diversity action brought in federal district court)).

The Court finds that Peterson's unjust enrichment claim fails under the law of either state. Neither Delaware nor California law provide an unjust enrichment remedy if the unjust enrichment claim arises from an actual contract. See, e.g., AM Gen. Holdings LLC v. Renco Grp., Inc., No. 7639-VCN, 2013 WL 5863010, at *15 (Del. Ch. Oct. 31, 2013) (granting motion to dismiss because unjust enrichment claim arose from an express contract); Durell v. Sharp Healthcare, 183 Cal. App. 4th 1350, 1370 (2010) (providing that an unjust enrichment claim does not lie where the parties have an enforceable express contract).

Peterson appears to respond that his argument survives because he is permitted to set out alternative claims. Opp'n at 12. Unjust enrichment, however, describes the theory that a defendant "has been unjustly conferred a benefit through mistake . . . [and t]he return of that benefit is the remedy typically sought in a quasi-contract cause of action." See Astiana v. The Hain Celestial Group, 783 F.3d 753, 762 (9th Cir. 2015). Here, Peterson has sued AWJ based on alleged breaches of the parties' LP Agreement. See Compl. ¶¶ 1–4. The parties do not contest the existence of that express contractual agreement, See Mot. at 1; Compl. ¶ 57, and unjust enrichment claims are unavailable in cases where, as here, the parties are bound to an express contract. See, e.g., Durell, 183 Cal. App. 4th at 1370 (providing that unjust enrichment is synonymous with restitution, and restitution is appropriate when the law needs to imply a contract to avoid unjust enrichment).

Peterson also notes that a transfer agent—Goldman—made the erroneous distribution here; he argues that because Goldman is not a party to the LP Agreement, he has properly

9

pled an unjust enrichment claim. Opp'n at 13.  Given that both parties agree that Goldman was Artis' agent, under basic agency principles, Goldman was bound by the acts of its agent. See, e.g., Stewart v. Wilmington Trust SP Servs., Inc., 112 A.3d 271, 303 (Del. Ch. 2015) (citing In re Brandywine Volkswagen, Ltd., 306 A.2d 24, 27 (Del. Super. 1973)) ("Delaware law adheres to this general rule of imputation—of holding a corporation liable for the acts and knowledge of its agents—even when the agent acts fraudulently or causes injury to third persons through illegal conduct."); see also Tomerlin v. Canadian Indem. Co., 394 P.2d 571, 574 (1964) (providing that actual authority exists when an agent reasonably believes that the principal consents to the agent's acts on behalf of the principal).  Peterson's attempt to distinguish Goldman's legal responsibilites from those of Artis fail under these basic agency principles.  See id.  The Court thus concludes that Peterson's unjust enrichment allegations fail to state a claim upon which relief can be granted, see Usher 828 F.2d at 561, and the Court DISMISSES the unjust enrichment claim.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES the Motion in part, as to the breach of contract claim, and GRANTS the Motion in part, as to the unjust enrichment claim.

**IT IS SO ORDERED.**

Dated: October 9, 2015

CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE